## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GGNSC CAMP HILL WEST SHORE,** | : | **CIVIL ACTION NO. 1:15-CV-445** |
| **LP, d/b/a GOLDEN LIVING CENTER** | : | |
| **WEST SHORE,** *et al.*, | : | **(Chief Judge Conner)** |
| | : | |
| **Petitioners** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SHIRLEY MAE THOMPSON, by and** | : | |
| **through her Attorney-in-Fact,** | : | |
| **MICHELE MULLEN,** | : | |
| | : | |
| **Respondent** | : | |

### MEMORANDUM

Presently before the court is the renewed motion (Doc. 24) to compel

arbitration filed by GGNSC Camp Hill West Shore, LP d/b/a Golden Living Center

West Shore, GPH Camp Hill West Shore, LP, Golden Gate National Senior Care,

LLC, GGNSC Holdings, LLC, GGNSC Equity Holdings, LLC, GGNSC

Administrative Services, LLC, GGNSC Clinical Services, LLC, and Golden Gate

Ancillary LLC, (collectively, "GGNSC").  The motion will be granted.

## I.    Factual Background & Procedural History

During the summer of 2013, Shirley Mae Thompson ("Thompson") resided at

Golden Living Center West Shore, a skilled nursing facility in Camp Hill,

Pennsylvania that is collectively owned and operated by the GGNSC petitioners.

(Doc. 1 ¶ 11; Doc. 12 ¶ 1).  Certain facts germane to the instant motion precede

Thompson's residence at the GGNSC facility.  On May 26, 2013, at the age of eighty-

one, Thompson suffered a fall at her home and remained without assistance for

three to four days.  (Doc. 24-1, Ex. D, Michele Mullen Dep. 8:12-19, 9:19-21, July 24,

2015 ("Mullen Dep."); Doc. 28-5 at 2).  She was admitted to Harrisburg Hospital on

May 29, 2013.  (Doc. 28-5 at 3).  Upon her admission, Thompson was diagnosed with

dehydration, muscle deterioration, and renal failure.  (Id.)

On May 31, 2013, GGNSC nurse and hospital liaison Buffy Weiland Finney

("Finney") met with Thompson to discuss her prospective transfer to Golden Living

Center West Shore.  (Doc. 24-1 ¶ 1; Doc. 28 at 8-9).  Finney presented to Thompson a

"quick pack"[1] containing, *inter alia*, a four-page voluntary Alternative Dispute

Resolution Agreement ("ADR Agreement").  (Doc. 24-1 ¶¶ 2, 4; Doc. 28 at 9).  The

ADR Agreement mandates that any dispute arising out of Thompson's stay at the

facility "shall be resolved exclusively by an ADR process that shall include

mediation and, where mediation is not successful, binding arbitration."  (Doc. 24-1,

Ex. B, at 28).  It expressly includes within its scope any claims sounding in tort,

negligence, gross negligence, malpractice, and "any alleged departure from any

applicable federal, state, or local medical, health care, consumer, or safety

standards."  (Id. at 29).

The voluntary nature of the ADR Agreement is emphasized at the top of the

first page with the statement that "**THIS AGREEMENT IS <u>NOT</u> A CONDITION**

**OF ADMISSION TO OR CONTINUED RESIDENCE IN THE FACILITY**."  (Id.

at 28).  The ADR Agreement further provides:

> **THE PARTIES UNDERSTAND, ACKNOWLEDGE,**
> **AND AGREE THAT THEY ARE SELECTING A**

---

[1] A pamphlet containing information about state medical assistance and a booklet of various GGNSC admission-related documents comprised the "quick-pack."  (See Doc. 24-1, Ex. A, Buffy Weiland Finney Dep. 19:5-11, 22:24-23:7, June 26, 2015 ("Finney Dep.")).

> **METHOD OF RESOLVING DISPUTES WITHOUT
> RESORTING TO LAWSUITS OR THE COURTS, AND
> THAT BY ENTERING INTO THIS AGREEMENT,
> THEY ARE GIVING UP THEIR CONSTITUTIONAL
> RIGHT TO HAVE THEIR DISPUTES DECIDED IN A
> COURT OF LAW BY A JUDGE OR JURY.**
>
> . . .
>
> The Resident understands that he or she has the right to
> seek advice of legal counsel concerning this Agreement;
> that his or her signing of this Agreement is not a
> condition of admission to or residence in the Facility;
> [and] that he or she may revoke this Agreement by
> sending written notice to the Facility within thirty (30)
> days of signing it.

(Id. at 28, 30).

The ADR Agreement specifies that the arbitration process is to be

administered by JAMS, a private alternative dispute resolution provider.  (Id. at 29).

When a resident initiates arbitration, the required fee is $250, and "all other [JAMS]

fees and costs . . . shall be paid by Facility."  (Id. at 30).  Thompson signed the ADR

Agreement during her meeting with Finney.[2]  (Doc. 24-1 ¶ 5; Doc. 28 at 8; see also

Doc. 24-1, Ex. B, at 31).  She was admitted to Golden Living Center West Shore

several days thereafter, on June 4, 2013.  (Doc. 24-1 ¶ 9; Doc. 28 at 8).

On February 13, 2015, Thompson filed a complaint against GGNSC in the

Court of Common Pleas of Cumberland County, Pennsylvania, through her

attorney-in-fact Michele Mullen.  (Doc. 24-1 ¶ 26; Doc. 28 at 6; see also Doc. 12, Ex.

A).  According to the complaint, Thompson's three-month stay at Golden Living

---

[2] Prior to discovery, the parties identified June 4, 2013 as the date upon which
Thompson signed the ADR Agreement, but they now agree on May 31, 2013 as the
signing date.  (See Doc. 24-1 ¶¶ 1, 5; Doc. 28 at 8).

Center West Shore was marked by severe mistreatment resulting in substantial injuries. (Doc. 12, Ex. A, ¶¶ 25-75). Thompson asserts claims sounding in negligence, generally, as well as corporate negligence, negligence *per se*, and departure from applicable statutory standards of care. (Id. ¶¶ 76-108).

On March 3, 2015, GGNSC filed a petition (Doc. 1) in this court to compel enforcement of the ADR Agreement. In response, Thompson raised contract defenses of unconscionability and lack of capacity. (Doc. 18 at 26-33). On April 28, 2015, the court stayed Thompson's state court action and denied GGNSC's petition without prejudice to its renewal after a period of limited discovery on the validity and enforceability of the ADR Agreement. (Doc. 21). As this court previously noted, when a court so permits discovery, any "renewed motion to compel arbitration" will be judged "under a summary judgment standard." GGNSC Camp Hill W. Shore, LP v. Thompson *ex rel.* Mullen, No. 1:15-CV-445, 2015 WL 1932330, at *7 (M.D. Pa. Apr. 28, 2015) (Conner, C.J.) (quoting Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764, 776 (3d Cir. 2013)). On September 22, 2015, GGNSC filed a renewed motion (Doc. 24) to compel arbitration. The motion is fully briefed and ripe for disposition under the applicable Rule 56 standard.

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

## III.  Discussion

Questions of arbitrability are governed by the Federal Arbitration Act ("FAA").  See 9 U.S.C. § 2; Quilloin v. Tenet Health Sys. Phila., Inc., 673 F.3d 221, 228 (3d Cir. 2012).  The FAA reflects "a liberal federal policy favoring arbitration agreements."  Quilloin, 673 F.3d at 228 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).  Notwithstanding its favored status, arbitration is squarely a matter of contract.  Arbitration agreements may be deemed unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; see also AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011).  To determine whether a party should be compelled to arbitrate, a court must evaluate: (1) whether, under principles of state contract law, the parties formed a valid agreement to arbitrate; and (2) "whether the merits-based dispute in question falls within the scope of that valid agreement."  Flintkote Co. v. Aviva PLC, 769 F.3d 215, 220 (3d Cir. 2014) (quoting Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 527 (3d Cir. 2009)).

In the case *sub judice*, Thompson solely challenges the existence of a valid and enforceable arbitration contract.  (See Doc. 28).  Specifically, she asserts

defenses of lack of capacity, unconscionability, and derogation of the Seventh Amendment right to trial by jury.  (Id. at 14-24).  The court considers these issues *seriatim*.

    **A.**    **Capacity to Contract**

    Under Pennsylvania law, an adult party who enters into an agreement is presumed competent.  Estate of McGovern v. State Emps.' Ret. Bd., 517 A.2d 523, 526 (Pa. 1986) (citing Taylor v. Avi, 415 A.2d 894, 896 (Pa. Super. Ct. 1979)), overruled on other grounds by Leon E. Wintermyer, Inc. v. WCAB (Marlowe), 812 A.2d 478 (Pa. 2002); see also Hartman v. Sabor Healthcare Grp., No. 3:14-CV-2167, 2015 WL 5569148, at *5 (M.D. Pa. Sept. 21, 2015).  Mental incompetence must be shown with "clear, precise, and convincing" evidence.  Elliott v. Clawson, 204 A.2d 272, 273 (Pa. 1964).  A mentally incompetent person is one who cannot understand "the nature and consequences of the transaction."  Forman v. Pub. Sch. Emps.' Ret. Bd., 778 A.2d 778, 780 (Pa. Commw. Ct. 2001).  The critical inquiry is whether a person was competent "at the very time" the instrument was executed.  Weir by Gasper v. Estate of Ciao, 556 A.2d 819, 824 (Pa. 1989).  The person's words and conduct are most relevant to the analysis.  Id.  Moreover, testimony by individuals who "observed the alleged incompetent on the date in question" is entitled to greater weight than testimony based upon prior or subsequent observations.  Id.

    "Mere weakness of intellect" resulting from illness or senescence will not suffice to set aside a contract.  Taylor, 415 A.2d at 897.  Similarly, evidence of memory failure does not establish lack of capacity, "unless it is total or so extended as to make incapacity practically certain."  Id. (quoting *In re* Lawrence's Estate, 132

6

A. 786, 789 (Pa. 1926)).  The mental defect at issue must engender "inability to comprehend the contract."  McGovern, 517 A.2d at 526 (quoting Law v. Mackie, 95 A.2d 656, 663-64 (Pa. 1953)).

To support her capacity defense, Thompson relies principally upon medical records maintained during her recovery period.  (Doc. 28 at 16).  These include hospital documents from May 31, 2016, the date that Thompson signed the ADR Agreement.  (Id.)  Namely, a "Clinical Flowsheet Report" notes Thompson's cognitive and auditory "learning barriers."  (Doc. 28-6 at 2-3).  Further, a hospital staff member described Thompson as "forgetful" and exhibiting some confusion during an assessment time-marked 1:31 A.M.  (Id. at 25).  Thompson also submits evaluations performed at Golden Living Center West Shore which detail her attention deficit.  (Docs. 28-8, 28-9).  Finally, Thompson bolsters her medical evidence with testimony by Mullen, who is her great-niece and caretaker in addition to her attorney-in-fact.  (Doc. 24-1 ¶ 12; Doc. 28 at 11).  Mullen stated that she has always known Thompson to lack understanding of even casual conversation and to have a skewed perception of reality.  (See Doc. 28 at 16; Mullen Dep. 42:5-6, 43:19-20).

The above evidence does not give rise to an issue of material fact as to Thompson's capacity to agree to arbitrate.  The most pertinent evidence—the May 31, 2013 medical records—fails to transcend "mere mental weakness" or memory deficiency.  Cf. Datto v. Harrison, 506 F. App'x 160, 164 (3d Cir. 2012) (nonprecedential); Hartman, 2015 WL 5569148, at *5-7; McGovern, 517 A.2d at 526-27; Weir, 556 A.2d at 824-25; Garcia ex rel. Eckert v. HCR ManorCare, LLC, No.

1743, 2016 WL 127514, at *8-9 (Pa. Super. Ct. 2016); <u>Taylor</u>, 415 A.2d at 896-98.

These same records indicate that hospital staff were able to communicate with

Thompson about her diet, medications, and safety precautions.  (<u>See</u> Doc. 28-6 at 2).

Indeed, hospital staff at no point indicated to Mullen difficulties communicating

with Thompson.  (<u>See</u> Mullen Dep. 84:6-11).  The less proximate Golden Living

Center West Shore evaluations describe focus difficulties but not a fundamental

inability to comprehend.  (<u>See</u> Docs. 28-8, 28-9).  Moreover, these later evaluations

are of dubious reliability for the purpose of determining capacity, as Mullin admits

that Thompson's cognitive state has been subject to substantial variation.  (<u>See</u>

Mullen Dep. 95:20-96:12); <u>cf. Weir</u>, 556 A.2d at 825.

     The testimony offered by Mullen is also unavailing.  Mullen suggests that

Thompson lacked contracting capacity generally, even prior to her fall.  (Mullen

Dep. 26:3-22).  Her intimation is belied by ample evidence of Thompson's

independent living prior to her hospital admission.  (<u>Id.</u> 77:10-78:19).  Mullen cannot

offer appropriately timely and particularized observations, as she was not present

when Thompson signed the ADR Agreement and did not visit Thompson that day.

(<u>Id.</u> 83:1-5).  The only other person with Thompson upon signing, Finney, could no

longer recall her meeting with Thompson by the time of her deposition.  (Finney

Dep. 6:2-3).  However, Finney testified that, as a matter of practice, she would

engage a resident in execution of admission documents only when she or he

appeared cognizant of the circumstances and substance of said documents.  (<u>Id.</u>

44:10-12, 53:23-54:24).

For all of these reasons, Thompson cannot satisfy the rigorous "clear, precise, and convincing" evidentiary standard for proving lack of capacity to contract. Elliott, 204 A.2d at 273.

## B.   Unconscionability

To prove that a contract is unconscionable and therefore invalid, a party must show both procedural and substantive unconscionability. Quilloin, 673 F.3d at 230 (citing Salley v. Option One Mortg. Corp., 925 A.2d 115, 119 (Pa. 2007)). The Supreme Court of Pennsylvania has indicated that a "sliding-scale" approach may be appropriate whereby, for example, "[when] the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required." Salley, 925 A.2d at 125 n.12.

### 1.   *Procedural Unconscionability*

Procedural unconscionability concerns the process of reaching an agreement, including the form in which the contract document is presented. See Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999). A contract is procedurally unconscionable when there is "a lack of meaningful choice in [its] acceptance." Salley, 925 A.2d at 119. A court must consider the following factors: (1) the " 'take-it-or-leave it' nature of the standardized form of the document;" (2) the "relative bargaining positions" of the parties; and (3) "the degree of economic compulsion motivating" the signatory. Quilloin, 673 F.3d at 235-36 (quoting Salley, 925 A.2d at 125).

Generally, a contract of adhesion will be deemed procedurally unconscionable. Id. at 235 (citing McNulty v. H & R Block, Inc., 843 A.2d 1267, 1273

9

(Pa. Super. Ct. 2004)).  A contract of adhesion is a "standard-form contract" that is prepared by one party and signed by another party who is typically in a weaker position and "adheres to the contract with little choice about the terms." <u>Id.</u> (quoting <u>Chepkevich v. Hidden Valley Resort, L.P.</u>, 2 A.3d 1174, 1190 (Pa. 2010)); <u>see also</u> <u>Hopkins v. New Day Fin.</u>, 643 F. Supp. 2d 704, 717 (E.D. Pa. 2009) (citing <u>Denlinger, Inc. v. Dendler</u>, 608 A.2d 1061, 1068 (Pa. Super. Ct. 1992)).

 Bargaining power disparity alone does not necessitate a finding of procedural unconscionability.  <u>See</u> <u>Witmer v. Exxon Corp.</u>, 434 A.2d 1222, 1228 (Pa. 1981).  Rather, it is those contracts offending "strong public policy" which rise to an unconscionable level.  <u>Quillon</u>, 673 F.3d at 235 (quoting <u>Salley</u>, 925 A.2d at 119 n.3).  An agreement marked by "oppression and unfair surprise" may meet this standard. <u>Id.</u>  Moreover, an arbitration agreement resulting "from the sort of fraud or overwhelming economic power" that would ground revocation of any contract may constitute procedural unconscionability.  <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 33 (1991).

Thompson argues that GGNSC's arbitration agreement is a contract of adhesion.  (Doc. 28 at 22).  She further asserts that the agreement was made under the following circumstances and therefore evinces a lack of meaningful choice: Thompson was elderly and in recovery for her fall; she was not well-educated; and, the ADR Agreement was "tucked inside two booklets of complicated, and unrelated, admissions documents."  (<u>Id.</u>)

The court finds Thompson's evidence insufficient to support a finding of procedural unconscionability.  The ADR Agreement's voluntary nature is

conspicuously announced in bold, capitalized lettering.  (See Doc. 24-1, Ex. B, at 28).

Further, the ADR Agreement affords residents the opportunity for revocation

within thirty days.  (Id. at 30).  It thus lacks the "take-it-or-leave-it" quality of a

contract of adhesion.  See Golden Gate Nat'l Senior Care, LLC v. Sulpizio, No. 1:15-

CV-174, 2016 WL 1271333, at *6 (M.D. Pa. Mar. 31, 2016); Clouser v. Golden Gate

Nat'l Senior Care, LLC, No. 3:15-33, 2016 WL 1179214, at *7 (W.D. Pa. Mar. 23,

2016).  The ADR Agreement is a short, plainly-worded document that emphasizes

its key function, to wit: a bilateral, voluntary agreement to arbitrate claims.  (Doc.

24-1, Ex. B, at 28-31).  Even accounting for Thompson's weakened condition, as

compared to her pre-fall self-sufficiency, Thompson's agreement to arbitrate did not

involve the "oppression and unfair surprise" indicative of procedural

unconscionability.  Cf. Sulpizio, 2016 WL 1271333, at *7; Clouser, 2016 WL 1179214,

at *7; Golden Gate Nat'l Senior Care, LLC v. Beavens, 123 F. Supp. 3d 619, 631-33

(E.D. Pa. 2015).  Finally, Thompson points to no evidence of economic compulsion

to sign the agreement, and the court finds none.

        2.      *Substantive Unconscionability*

        Even assuming *arguendo* that the ADR Agreement involved some degree of

procedural unconscionability, it was not substantively unconscionable.  A contract

is substantively unconscionable when its terms are "unreasonably or grossly

favorable to one side" and the "disfavored party does not assent" to them.  See

Quillon, 673 F.3d at 230 (citing Green Tree, 183 F.3d at 181).  An arbitration

agreement that does not "alter or limit the rights and remedies available to [a]

party" in arbitration will generally not be found substantively unconscionable.  Id.

(quoting Edwards v. HOVENSA, LLC, 497 F.3d 355, 364 (3d Cir. 2007)).  According to Thompson, the requirement that the arbitration process be administered by JAMS demonstrates substantive unconscionability by placing too heavy an economic burden on her.  (Doc. 28 at 23-24).

The application of JAMS rules in the arbitral forum does not result in the substantive unconscionability of the ADR Agreement.  The ADR Agreement limits the resident's fee for initiating arbitration to $250.  (Doc. 24-1, Ex. B, at 30).  The express purpose of this limitation is to "approximate[ ] . . . a court filing fee."  (Id.) Remaining arbitration fees and costs "shall be paid by [GGNSC]."  (Id.)  As multiple other courts in this circuit have held, this structure of monetary burdens does not support a finding of substantive unconscionability.  See, e.g., Sulpizio, 2016 WL 1271333, at *5; Clouser, 2016 WL 1179214, at *7; Beavens, 123 F. Supp. 3d at 631-32. Cf. Brown v. Sklar-Markind, No. 14-266, 2014 WL 5803135, at *9-10 (W.D. Pa. Nov. 7, 2014).  The court concludes that Thompson has failed to adduce evidence of either procedural or substantive unconscionability.  The ADR Agreement is therefore not unconscionable.[3]

---

[3] Thompson also submits a defense to enforcement of the ADR Agreement that is styled as a lack of mutual assent or "meeting of the minds."  (Doc. 28 at 18-20).  Distilled to its essence, Thompson's argument is that she did not assent to arbitration because, *first*, she lacked capacity to do so and, *second*, she had no meaningful choice in light of the circumstances under which she signed the agreement.  (Id. at 19-20).  These contentions merely repeat points from her capacity and procedural unconscionability defenses.  It is undisputed that Thompson signed the ADR Agreement, and the court has already rejected Thompson's substantive contract defenses.  (See *supra* Part III.A-B).  Her redundant absence-of-mutual-assent defense is no more persuasive.

### C.      Right to Jury Trial

Thompson's remaining argument against enforcement of the arbitration agreement is the asserted absence of a "knowing and voluntary" waiver of her constitutional right to a jury trial.  (Doc. 28 at 20); see also U.S. CONST. amend. VII; First Union Nat'l Bank v. United States, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001). However, the court need not consider whether the "knowing and voluntary" standard is met in the instant case.  The United States Court of Appeals for the Third Circuit has found that application of this heightened standard "would be inconsistent with the FAA" and Supreme Court precedent cabining defenses to arbitration agreements to "generally applicable principle[s] of contract law."  Seus v. John Nuveen & Co., Inc., 146 F.3d 175, 183-84 (3d Cir. 1998) (citing Gilmer, 500 U.S. at 25), overruled on other grounds by Green Tree Fin. Corp.—Al. v. Randolph, 531 U.S. 79 (2000).  Consequently, Thompson's final challenge to the ADR Agreement is unavailing.

In light of the foregoing, the court concludes that Thompson has not met her burden of showing that the ADR agreement is invalid or otherwise unenforceable. Accordingly, GGNSC is entitled to resolution of Thompson's claims through mediation or arbitration per the terms of the ADR Agreement.[4]

---

[4] The parties also briefed the matter of whether Thompson would be entitled to a jury trial in the event that the arbitration agreement proved invalid.  (See Docs. 31, 34).  The court's conclusion obviates the need to consider this issue.

**IV.**   **<u>Conclusion</u>**

The renewed motion (Doc. 24) to compel arbitration filed by GGNSC will be

granted.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      June 22, 2016